1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **SOUTHERN DISTRICT OF CALIFORNIA**

10   UNITED STATES OF AMERICA,            CASE NO. 12CR3429 WQH
11                          Plaintiff,    ORDER
             vs.
12   TERENCE J. BONNER,
13                          Defendant.

14   Hayes, Judge:

15          The matters before the Court are: (1) Defendant's motion to suppress seized

16   evidence from Defendant's home in Campo, California (ECF No. 24); (2) Defendant's

17   motion for suppression of evidence warrant 12MJ4280 (ECF No. 33); and (3)

18   Defendant's motion to suppress seized evidence from Mr. Bonner's home (ECF No.

19   34).

20                          **BACKGROUND FACTS**

21          In December of 2009, Special Agent Rebecca Phenicie of United States Customs

22   and Border Patrol Internal Affairs was assigned to the investigation of vouchers

23   submitted by the Defendant Terence J. Bonner for reimbursement of travel expenses for

24   the period 2004 - 2009.   Defendant was the president of the National Border Patrol

25   Council ("the Union") from February 1989 to March 2011.  The Council is the union

26   that represents United States Customs and Border Patrol employees.

27          On March 8, 2012, a United States Magistrate Judge approved a search and

28   seizure warrant for Defendant's residence located at 29520 Primrose Drive, Campo,

California. The Application for a Warrant was supported by the Affidavit of Special Agent Rebecca Phenicie.

On March 9, 2012, shortly before 8:00 a.m., Special Agent Phenicie and other law enforcement officers executed the search warrant at the Bonner residence. Agents seized 18 boxes of paper documents and 35 items of electronic media. Agent Phenicie reviewed the paper documents. Digital evidence forensic examiners imaged and examined the seized electronic media.

On August 16, 2012, the federal grand jury in the Southern District of California returned an Indictment charging Defendant with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and eleven counts of wire fraud in violation of 18 U.S.C. § 1343. (ECF No. 1).

On August 20, 2012, Defendant was arraigned on the Indictment and entered pleas of not guilty. (ECF No. 4).

On November 21, 2012, Agent Phenicie presented an Application for Search Warrant to a Magistrate Judge seeking authorization to search "documents and digital images seized during the March 8, 2012 search of 29520 Primrose Drive, Campos, California 91906 currently in the possession of CBP IA... for the period January 1, 1993 to the present." (ECF No. 33-2 at 4).

## RULINGS OF THE COURT

**<u>Defendant's motion to suppress seized evidence from his residence</u>** **(ECF No. 24);**

**A. Facts**

Prior to executing the warrant, the investigative team ran queries in the law enforcement databases and learned that Defendant was the registered owner of over a dozen weapons. Based upon this information, agents saw the need to exercise particular caution at the outset.

On March 9, 2012 at approximately 8 a.m., agents knocked on the front door of the Defendant's residence and identified law enforcement stating that they were executing a search warrant. Defendant Bonner answered the door. Defendant was

asked to step outside the house and handcuffed behind his back. Law enforcement officers, including Special Agent Phenicie entered the house to do a protective sweep. As Special Agent Phenicie entered the house at the tail end of the entry team, Defendant was being led outside by an agent. Defendant asked Special Agent Phenicie to see a copy of the warrant. Special Agent Phenicie told the Defendant that she would provide him with the warrant once the "dust settles." (ECF No. 43 at 58).

Immediately upon entry of the house, the entry team noticed that the house was in a state of serious disarray. The rooms were filled with various objects, clothes, and stacks of boxes. In some rooms, the agents could not see the floor beyond the threshold of the room. In places throughout the house, there were thick layers of dust and what appeared to be animal hair. Within minutes, officers were coughing from the dust and hair. The initial protective sweep and the search were prolonged by the condition of the house.

While outside the house, Defendant asked the Agent Porter to see a copy of the warrant. Agent Porter told the Defendant that the case agent would decide when he would be able to see the warrant. After several minutes, Defendant told the agent that the handcuffs were too tight and were pinching his wrists. The agent loosened the handcuffs. After a few minutes, Defendant told the agent that the handcuffs were still too tight. The agent stated that the handcuffs were loose enough and did not loosen them again. Defendant Bonner remained handcuffed for approximately 45 minutes and remained outside the house guarded by an agent throughout the search.

The last vehicle left the Bonner residence at approximately 1:30 p.m. At the conclusion of the search, Special Agent Phenicie provided Defendant with a copy of the search warrant and the inventory of the items seized. Special Agent Phenicie testified that it was not her "intention to refuse [Defendant] a copy until the end of the search." *Id*. at 70. Agent Phenicie testified that she was "taught that [the supervising agent] had to leave a copy of the warrant ... and ... an inventory." *Id*. at 53.

12CR3429 WQH

## B. Contentions of the Parties

Defendant moves the Court to suppress evidence seized from his residence on March 9, 2012 on the grounds that agents refused his request to provide him with the search warrant at the outset of the search. Defendant asserts that *United States v. Gantt*[1] is the controlling Ninth Circuit case law and required the agents to give him a complete copy of the search warrant at the outset of the search. Defendant asserts that suppression is required on the grounds that the flagrant disregard of the law by the agents caused him needless exacerbation of his anxiety.

The Government asserts that there was no legal requirement to provide the Defendant with the search warrant at the outset of the search. The Government contends that the United States Supreme Court rejected the Ninth Circuit's position in *Gantt* that the defendant was entitled to a copy of the search warrant at the outset of the search in *United States v. Grubbs*, 547 U.S. 90 (2006). The Government asserts that the failure to provide the Defendant with the search warrant at the outset of the search does not violate the Fourth Amendment, and that there was no prejudice to the Defendant in this case.

## C. Applicable Law

Rule 41 (f)(1)(C) of the Federal Rules of Criminal Procedure, formerly Rule 41(d) provides: "The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from who, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property." Fed. R. Crim. P. 41(f)(1)(C).

In *Gantt*, the Court of Appeals for the Ninth Circuit held that the Government violated Rule 41(d) by failing to present Gantt with a complete copy of the warrant at the outset of the search of her apartment. The Court explained:

In light of [] Supreme Court and Ninth Circuit precedents, there can be no

---

[1] 194 F.3d 987 (9th Cir. 1999), overruled on other grounds by *United States v. W.R. Grace*, 526 F.3d 449 (9th Cir. 2008).

doubt that the essential functions of the search warrant include assuring the subject of the search that her privacy is invaded only under a legal warrant and notifying her of the extent of the officer's authority. The government's proposed reading of Rule 41(d) ignores these essential functions. If a person is present at the search of her premises, agents are faithful to the "assurance" and "notice" functions of the warrant only if they serve the warrant at the outset of the search. A warrant served after the search is completed cannot timely provide the property owner with sufficient information to reassure him of the entry's legality.

*Gantt*, 194 F.3d at 991 (quotations omitted). The Court of Appeals in *Gantt* "conclude[d] that, absent exigent circumstances, if a person is present at the search of her premises, Rule 41(d) requires officers to give her a complete copy of the warrant at the outset of the search." *Id*. at 994. The Court of Appeals noted that "violations of Rule 41(d) do not usually demand suppression" but determined that suppression of the evidence was required because of a "deliberate" violation of the rule. *Id*. at 1005; s*ee also United States v. Mann*, 389 F.3d 869, 875 (9th Cir. 2004). ("[W]e acknowledged [in *Gantt*], however, that suppression would not be required unless the officers disregarded the Rule or the defendant was prejudiced.").

In *United States v. Grubbs*, 547 U.S. 90 (2006), the United States Supreme Court reversed the conclusion of the Court of Appeals for the Ninth Circuit that evidence seized pursuant to a warrant should be suppressed because postal inspectors failed to present the affidavit with the warrant at the outset of the search. The Supreme Court specifically addressed the argument of the respondent "that the executing officer must present the property owner with a copy of the warrant before conducting his search." *Id*. at 98. The Supreme Court concluded that "neither the Fourth Amendment nor Federal Rule of Criminal Procedure 41 imposes such a requirement." *Id.* The Supreme Court explained:

The absence of a constitutional requirement that the warrant be exhibited at the outset of the search, or indeed until the search has ended, is ... evidence that the requirement of particular description does not protect an interest in monitoring searches. The Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*, the deliberate, impartial judgment of a judicial officer ... between the citizen and the police, and by providing, *ex post*, a right to suppress evidence improperly obtained and a cause of action for damages.

*Id.* at 99 (citations and quotations omitted); *see also Groh v. Ramirez*, 540 U.S. 551, 562 n.5 (2004) ("[N]either the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search.").

After the United States Supreme Court decided *Grubbs*, the Court of Appeals in *United States v. Hector*, 474 F.3d 1150 (9th Cir. 2007) reviewed the grant of a motion to suppress by the district court on the grounds that the officer failed to serve Hector with a copy of the warrant at the time of the search. The Court of Appeals reversed the grant of suppression explaining:

> The district court relied on the then newly-issued decision in United *States v. Martinez–Garcia*, 397 F.3d 1205, 1212 n. 3 (9th Cir. 2005) (noting that a search "may be presumptively unreasonable if officers fail entirely to serve a sufficient warrant at any time before, during or immediately after a search of a home."). The key premise underlying the presentation requirement is that "[a]bsent such presentation, individuals would stand [no] real chance of policing the officers' conduct." *United States v. Grubbs*, 377 F.3d 1072, 1079 (9th Cir. 2004) ( *Grubbs* I ) (internal quotation marks and citation omitted). However, after the district court granted Hector's motion to suppress, the Supreme Court decided *United States v. Grubbs*, 547 U.S. 90, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006) ( *Grubbs* II ), which specifically rejected the policing rationale. It is not clear whether *Grubbs* II overrules the Ninth Circuit's precedent on the requirement to present a copy of the warrant to the owner of the premises at the time of the search. But we need not resolve this issue here, as we rely on *Hudson* [*v. Michigan*, 547 U.S. 586 (2006)] to hold that regardless of whether the failure to serve a copy of the warrant was a violation of the Fourth Amendment, the exclusionary rule should not be applied in this case.
>
> In *Hudson*, the police officers had a valid search warrant for drugs and firearms, but entered Hudson's home in violation of the Fourth Amendment's knock-and-announce rule. According to the Supreme Court, the violation did not warrant suppression of the evidence obtained from the search because the knock-and-announce violation was not the unattenuated but-for cause of obtaining the evidence. In articulating this principle, the Supreme Court first explained: "Whether [the violation] had occurred or *not*, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house." *Hudson*, 126 S.Ct. at 2164 (emphasis in original).

*Hector*, 474 F.3d at 1154. The Court of Appeals in *Hector* concluded "[h]ere, as in *Hudson*, given that a valid search warrant entitled the officers to retrieve drugs and firearms in the apartment, resort to the massive remedy of suppressing evidence of guilt

is unjustified." *Id.* at 1155 (citation and quotation omitted). The Court of Appeals found that the "causal connection between the failure to serve the warrant and the evidence seized is highly attenuated, indeed non-existent, in this case" and concluded that suppression was not an appropriate remedy. *Id.*

The interest protected in *Gantt* providing "the property owner with sufficient information to reassure him of the entry's legality" was addressed and specifically rejected by the United States Supreme Court in *Grubbs*. *Gantt,* 194 F.2d at 991. The Supreme Court stated:

> The Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, ex ante, the "deliberate, impartial judgment of a judicial officer ... between the citizen and the police," *Wong Sun v. United States*, 371 U.S. 471, 481–482, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and by providing, ex post, a right to suppress evidence improperly obtained and a cause of action for damages.

*Grubbs*, 547 U.S. at 99. *But see United States v. Williamson*, 439 F.3d 1125, 1132 n.4 (9th Cir. 2006) ("we will assume that *Gantt* remains good law in this Circuit"); and *Hector,* 474 F.3d at 1154 ("It is not clear whether *Grubbs* II overrules the Ninth Circuit's precedent on the requirement to present a copy of the warrant to the owner of the premises at the time of the search.").

## D. Ruling of the Court

In this case, there was a valid search warrant. There is no evidence that the agents intentionally disregarded of any provision of the federal rules or that the agents acted in a manner causing the Defendant needless anxiety. The Court concludes that there is no "causal connection" between failing to provide the warrant to the Defendant at the outset of the search and the evidence and that there was no prejudice to the Defendant. *Hector*, 474 F.3d at 1155.

The agents testified that they were not aware that the Defendant was entitled to a copy of the warrant at the onset of the search. Assuming that the *Gantt* rule survives in this circuit, even after the United States Supreme Court concluded that "neither the

Fourth Amendment nor Rule 41 impose a requirement to present the property owner with a copy of the warrant before conducting [the] search," there is no evidence in this record that the agents deliberately disregarded this requirement. *Grubbs*, 547 U.S. at 98. In *Williamson*, the Court of Appeals reaffirmed the statement in *Gantt* that "suppression is rarely the proper remedy for a Rule 41 violation." *Williamson*, 439 F.3d at 1132. The Court of Appeals explained:

> Our cases show, therefore, that where the agent executing the warrant is unaware of the Rule but acts in good faith in executing what he or she believes to be the Rule, he or she has not acted in deliberate disregard of it; thus suppression is not appropriate, assuming that the officer's actions result in no prejudice to the defendant and that the error does not rise to the level of a constitutional violation. Williamson argues that refusing to suppress rewards ignorance of the law. However, we do not condone an officer's ignorance of established law. We simply recognize here that a legal error does not merit suppression where the mistake has no material effect on the defendant's rights. *See, e.g., Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Here, Agent Nielsen acted in good faith, Williamson suffered no prejudice, and the error was not of a constitutional magnitude. The district court quite properly denied the motion to suppress.

*Id.* at 1134. Even assuming that the agents made a legal error when they did not present the search warrant at the outset, the mistake had no material effect on Defendant's rights and there are no facts to support the application of the exclusionary rule under these circumstances. Defendant's motion to suppress seized evidence from residence (ECF No. 24) is denied.

**Defendant's motion for suppression of evidence warrant 12MJ4280 (ECF No. 33); Defendant's motion to suppress seized evidence from his home (ECF No. 34);**

**A. Facts**

On March 8, 2012, Special Agent Phenicie, presented an Application for a Search Warrant to the United States Magistrate Judge. Agent Phenicie included an affidavit stating that she was a Special Agent with Customs and Border Patrol Internal Affairs with experience in investigations involving "alleged wrongdoing by government employees, including criminal behavior, violations of CBP Standards of Conduct,

misuse of government databases, inappropriate association with criminal elements, and other employee misconduct." (ECF No. 34-3 at 4).

Agent Phenicie informed the Magistrate Judge in her affidavit that Terence J. Bonner was suspected of defrauding the Border Patrol Council, by submitting fraudulent claims for expenses and lost wages to the Union. Agent Phenicie stated that Bonner is a retired U.S. Border Patrol Agent, that Bonner is the former President of the Union, and that the Bonner worked from his home at 2920 Primrose Drive in Campo, California in his role as Union president. Agent Phenicie stated:

> Terence J. Bonner served for over 20 years as the President of the National Border Patrol Council. He is presently retired. Bonner is suspected of systematically abusing his longstanding role as President of the Union by, among other things, charging the Union for various personal expenses, including over one hundred trips to Chicago to visit his mistress, as well as trips to other cities to attend professional sporting events. Bonner is also suspected of fraudulently charging the Union for 'lost wages' based on Union work purportedly performed during overtime hours, on Sundays, federal holidays, nights, and annual leave hours.

*Id.* at 6. Agent Phenicie explained that she reviewed records provided by the Union. Based upon her review of the Union records, Agent Phenicie explained that Bonner submitted numerous claims to the Union for reimbursement of various expenses by voucher or by submitting credit card bills; and that the Union paid Bonner's credit card bills and vouchers. Agent Phenicie stated that she obtained records from credit card companies, rental car companies, and other vendors. Based upon the Union records and these third-party records, Agent Phenicie stated that she "believe[d] that Bonner submitted claims and received payment for a wide range of purchases, including hundreds of trips to non-Union locations, hotel stays, meals at upscale restaurants, transportation, electronics, books, luggage, and other personal items." *Id.* at 7. Agent Phenicie informed the Magistrate Judge that her review of the records revealed that many of the expenses that Bonner charged to the Union appeared to relate to trips that Bonner took to visit a woman in Chicago; and that the woman had testified before the grand jury regarding the fact of her relationship with Bonner, Bonner's trips to Chicago,

and hotel and restaurant expenses that Bonner had incurred on these visits. Agent Phenicie further explained to the Magistrate Judge that she has concluded from her review of Union records that Bonner caused the Union to make payments to Bonner for false claims for lost wages without adequate documentation in violation of Union policy.

Agent Phenicie stated in part:

> Based on the foregoing, there is probable cause to believe that Bonner engaged in a scheme to defraud the Union by knowingly and repeatedly submitting false claims for business expenses, in the form of vouchers and credit card statements. Bonner likewise knowingly and repeatedly submitted claims for 'lost wages' that were false, and payment of which violated Union policies that Bonner himself promulgated. The Union paid Bonner in full on these false claims. As described above, checks to Bonner issued by the Union were 'co-signed' with a signature stamp from Bonner himself. My rough estimate of losses to the Union as a result of Bonner's fraud substantially exceeds $200,000. Additionally, Bonner's bank records reflect that, after receiving checks from the Union as a result of his fraud, he deposited such checks in his personal bank account; several of these checks exceed $10,000.
>
> According to the current Union president, [],each Union officer was permitted to purchase at Union expense, for Union work, a desktop computer for use at home and a laptop computer for use during travel; and Bonner did make such purchases at Union expense.
>
> Based on the foregoing, there is probable cause to believe that evidence of Bonner's fraud as more fully described in Attachment B - including, for example, financial and payment records, communications, receipts, and other records in electronic and hard copy format - can be found in Bonner's home as identified in Attachment A.

*Id*. at 11.

As the "Basis for Items to be Seized," Agent Phenicie stated in part:

> During his time as President of the Union, Bonner traveled extensively, and claimed reimbursement from the Union for travel expenses. Records of his travel expenses, including records relating to air and hotel reservations, meals, car rental information, and other expenses would be maintained at his home in either hard copy or in electronic format, or both.
>
> Bonner used computers and electronic media at his home office for a number of purposes: for the storage of his work files, to communicate by

means of electronic mail to other Union officers and individuals, to electronically transmit vouchers for payment, to maintain copies of purchase receipts for business expenses, and to create spreadsheets and vouchers to submit to the Union for reimbursement. Bonner communicated by electronic mail and by fax with government and Union officials relating to his travel.

According to credit card statements, Bonner purchased a large amount of computer related electronics, including multiple hard drives, over the years on the Union-paid credit cards, and copies of invoices would be maintained in the home office.

As a union officer, Bonner was required by the Department of Labor to maintain purchase orders, receipts, accounts payable and receivable, notes, invoices, and other computer generated records, for purchases on or behalf of the union for a period of at least five years.

It is customary for people who work from home to retain financial records and documents at their residences. Such records and documents are frequently stored in hard copy and in electronic form, including but not limited to computer print outs, computer disks, zip disks, hard drives, and other memory storage media.

*Id*. at 4-5. Agent Phenicie stated in her affidavit that she had probable cause to seize records from Bonner's home described in her affidavit as "**Bank and financial statements and records,**" "**Business and personal expense records,**" "**Records relating to activities and whereabouts,**" "**Documents sufficient to identify dominion and control,**" "**Correspondence,**" and "**Cash and documents related to Cash.**" *Id*. at 5-6. Agent Phenicie described "**Records relating to activities and whereabouts**" as follows: "Records or data relating to Terence J. Bonner's day to day activities and whereabouts, including without limitation diaries, day planners, calendars, appointment books, phone and call records, and correspondence." *Id*. at 5. After setting forth the facts to establish probable cause and describing the records seized, Agent Phenicie included in her Affidavit "PROCEDURES FOR ELECTRONICALLY STORED INFORMATION" which set forth in detail the "procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to [the] warrant." *Id*. at 11-12. In detailing the

12CR3429 WQH

procedures related to "Computers and Other Electronically Stored Information," Special Agent Phenicie stated in part:

> With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

**Seizure and Retention of Instrumentalities**

> a.  Based upon the foregoing, there is probable cause to believe that any computers and electronic storage devices encountered during this search are instrumentalities of the offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided at Rule 41(c)(2), Fed. R. Crim. P., or were used in committing crime as provided at Rule 41(c)(3).  Consequently, the computers and other electronic storage devices, are subject to seizure, retention and possible forfeiture and destruction.  Computers, other electronic storage devices and media confirmed onsite to contain contraband, constitute fruits of crime or to have been used to commit crime will not be returned but will be imaged offsite and analyzed as provided beginning at subparagraph (c) below.  The onsite confirmation may be provided by an owner or user of the computer or storage device or, if feasible, may be obtained by conducting a limited onsite forensic examination to determine if the subject media contains any contraband or otherwise is an instrumentality.  Computers and other electronic storage devices and media not confirmed onsite as instrumentalities will be taken offsite for preliminary analysis in accordance with subparagraph (b) below.

> b.  The offsite imaging and preliminary analysis of computers, other electronic storage devices and media to confirm their status as instrumentalities will be conducted within forty five (45) days of seizure.  Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below.  If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the court.  An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

> c.  Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. . . .

**Identification and Extraction of Relevant Data**

> A forensic image is an exact physical copy of the hard drive or other media.  After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and

software. ...

Analyzing the contents of computer or other electronic storage devices, even without significant technical issues, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. . . .

Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days from the date of seizure pursuant to this warrant, absent further application to this court.

All forensic analysis of the imaged data will employ search protocols directed exclusively to identification of data within the scope of this warrant.

*Id*. at 13-16.

In the Order signed on March 8, 2012, the Magistrate Judge stated: "I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property." (ECF No. 34-2 at 2). The Magistrate Judge authorized the search of 2950 Primrose Drive, Campos California setting forth in Attachment B the following general categories of "**ITEMS TO BE SEIZED**" for the period January 1, 2004 to the present, "**limited to:**" "**Bank and financial statements and records**", "**Business and personal expense records,**" "**Records relating to activities and whereabouts,**" "**Documents sufficient to identify dominion and control,**" "**Correspondence between or by the above-listed individuals and/or entities,**" and "**Cash and documents related to cash.**" *Id*. at 5-6. The Magistrate Judge specifically described the "**Records relating to activities and whereabouts**" as follows: "All records or data relating to Terence J. Bonner's day to day activities and whereabouts, including without limitation diaries, day planners, calendars, appointment books, phone and call records, and correspondence." *Id*. at 5. Prior to the execution of the search

warrant, the agents met and reviewed the warrant and the affidavit supporting the warrant, including the "**ITEMS TO BE SEIZED**" in Attachment B.

On March 9, 2012, approximately ten agents formed the search team and executed the warrant. During the search, an agent photographed the scene and the location of items found and seized. The rooms in the house had boxes stacked approximately six high with limited access. The agents reviewed the contents of each box, including manila folders inside the boxes, in order to determine whether items within the scope of the warrant were contained within the boxes. The agents moved the boxes out of the rooms, reviewed the contents of the boxes, and returned the boxes to the rooms. When boxes were determined to contain information to be seized, they were taken outside while the rest of the house was searched. Most of the items seized were taken from two rooms in the house. Agents seized 18 boxes of paper documents and 35 items of electronic media in the search, including four computers (three laptops and one desktop), 20 external hard drives, eight floppy disks, two flash drives and a smart phone. Special Agent Phenicie reviewed the paper documents and returned approximately 14 boxes of items to defense counsel within a few months of the search.

Forensic examiners imaged 100% of the seized electronic media. (ECF No. 33-2 at 8).[2] Copies of the images were assigned to Customs and Border Patrol Internal Affairs digital evidence forensic examiners in different parts of the country for analysis. The examiners developed search protocols, including key word searches, directed to identify the records within the scope of the warrant, such as bank records, travel records, and credit card statements. In April 2012, Agent Phenicie requested forensic examiners to conduct an examination with respect to the dates and times associated with pornographic images and videos contained on the images.

---

[2]The devices were returned to the Defendant after copying.

Forensic examiner Agent Townsend testified at the evidentiary hearing[3] that he was first asked to do forensic work on the images in this case in March 2012. Agent Townsend testified that he received and reviewed the search warrant including the parameters of Attachment B and the requirement that the examination be completed within 120 days of the search. Agent Townsend testified that he limited his search to the items related to the alleged crimes in Attachment B from 2004 to the present. Agent Townsend testified that subsequent to the preliminary examination of the forensic copies, Agent Phenicie requested an examination with respect to pornographic images and videos contained on the seized images. Agent Townsend testified that he initially believed that the additional examination for pornographic images was "outside the scope" of the warrant. (ECF No. 68 at 50). Agent Townsend testified:

> Q. [defense counsel]: Well, you had read the warrant; correct?
> A. [Agent Townsend]: Yes, sir.
> Q. And you at least were aware of the categories of information set forth in the warrant?
> A. Yes, sir.
> Q. It was clear to you upon that reading that there is no mention of pornographic images?
> A. Yes, sir.

*Id*. Agent Townsend testified that he sought clarification from Agent Phenicie with respect to the search for "pornographic images ... not in the warrant." *Id*. Agent Townsend testified that Agent Phenicie informed him that the additional search of the pornographic images had been approved by the United States Attorney because "we're looking for the time and date stamp." *Id*. Agent Townsend testified that he continued his analysis of the images until approximately September 2012 when it was brought to his attention that it was beyond the 120 day period.[4] Agent Townsend testified that he

---

[3]The Court held three days of evidentiary hearing. At the conclusion of the last hearing, the Court confirmed with both parties that the proof was completed and held oral argument on the suppression motions.

[4]The 120 day period ended on July 7, 2012.

had heard from Agent Phenicie that they were obtaining extensions to allow more time, and that he did not know that anyone had obtained an extension. Agent Townsend testified that he was operating under the "assumption" that the extension had been obtained based upon his conversation with the case agent. *Id.* at 57.

Forensic examiner Agent Eberle testified at the evidentiary hearing that she was tasked in March 2012 with analyzing three lap top computers (a Dell, a Vaio, and a Compaq). Agent Eberle testified that she received an email with the search warrant, and that she read the search warrant. Agent Eberle testified that she received the copy of a hard drive with the three images of the laptops in the mail on March 29, 2012 along with the key word list. Agent Eberle testified:

> Q: [defense counsel] And prior to analyzing those laptops, did you construct a protocol and search terms for how you would analyze the laptops?
>
> A. [Agent Eberle]: Yes. A key word list was developed.
>
> Q: How did you go about developing that key word list?
>
> A: A memorandum had been e-mailed to the forensic specialists handling these computers that were seized. I drew key words from that list, and that is where I started the key word searching of these computers.
>
> I then went through the search warrant and verified the key words matched that with what the warrant was, pulled anything else that appeared to be of interest, and as it processed from the results I was gathering, I would search and find more key words, and the Special Agent over the case, Rebecca Phenicie, also provided additional key words.

(ECF No. 69 at 8). Agent Eberle testified that she limited her search to the parameters of the search warrant and the particular date range in the search warrant. Agent Eberle testified that on April 17, 2012 she was asked to look for pornographic images. Agent Eberle testified that she could not recall which agent asked her to look for pornographic images but did recall that she was asked to "look for pornographic images as the pornographic images would have shown what Mr. Bonner was doing on his computer at that given hour." *Id*. at 19. Agent Eberle testified that the March 8, 2012 search warrant authorized the search for pornographic images on page two of Attachment, line

12CR3429 WQH

number three, "stored photographs, videos, and text messages." Agent Eberle testified that "pornographic images are stored photographs and videos." [5] *Id*. at 15. Agent Eberle estimated that she extracted and examined "thousands" of pornographic images from the seized computer data. *Id*. at 26.

Agent Eberle testified that she went on vacation on July 22, 2012 and that extraction and review of data was completed on the Dell before she left on vacation. Agent Eberle testified that Agent Porth completed the work on the Sony Vaio.[6] Agent Eberle testified that she reaccessed the computer data on the hard drive three time after returning from vacation on July 18, 2012 and that she did not reaccess the original images after the 120 day period for the purposes of extracting additional data. Agent Eberle testified that she read the warrant including the 120 day limitation and that she made a mistake accessing the images after the 120 day period.

Forensic examiner Agent Porth testified that he was asked in July of 2012 to complete the examination of the image of a Sony Vaio laptop computer after Agent Eberle went on vacation. Agent Porth testified that he had done work on this case earlier and that he had "browsed over" the warrant. (ECF No. 68 at 14). Agent Porth testified that he completed his work in about a week looking for documents, such as airline reservations, credit card receipts, phone bills, and those types of items. Agent Porth testified that he did not limit his search to documents from 2004 to the present. Agent Porth testified that he was not aware of the 120 day deadline for completing the investigation of the computer data in the warrant.

The search of the computer images continued past July 7, 2012, the expiration of

---

[5]This section refers to "cellular telephone device(s) and any storage devices, such as SIM cards or flash memory devices attached to, inserted in or seized with the device." (ECF No. 34-2 at 6).

[6]Agent Eberle testified that work on the Compaq was stopped prior to her vacation because all evidence indicated that the Compaq belonged to the Defendant's son.

the 120 period provided in warrant. In all, three forensic examiners continued to access the images made of defendant's laptops until as late as September 7, 2012. Agent Porth testified that he was unaware of the 120 day requirement. Agent Townsend testified that he was aware of the 120 day period and he was operating under the assumption that extensions had been obtained to allow more time. Agent Eberle testified that she read the warrant and was aware of the 120 day period and made a mistake. On September 7, 2012, the counsel for the Government became aware of the work after the 120 day deadline and work on these drives stopped until the government obtained the November 2012 search warrant.

On November 21, 2012, the Government sought and received a second search warrant for the documents and digital images seized during the March 9, 2012 search of Primrose Drive which were already in the possession of the Government. The Affidavit of Special Agent Phenicie in support of the November 2012 search warrant set forth the facts related to the work done on the electronic data after the 120 day period had expired, and expanded the time frame of the March warrant to include January 1993 through to March 9, 2012. In the Affidavit, Agent Phenicie explained to the Magistrate Judge that a large amount of electronic evidence was seized from the Defendant's residence in the search on March 9, 2012; that the hard drives seized contain "millions of images of pornography;" and that due to a "calendaring error" forensic analysts continued to access the original images beyond the initial 120-day period for identification and extraction of data. (ECF No. 33-2 at 8).

**B.  Contentions of the parties**

Defendant moves the Court for an order to suppress all evidence seized from his Campo residence on March 9, 2012 on the following grounds: 1) the government seized evidence beyond the scope of the warrant, 2) the government seized privileged

communication between Defendant and attorneys,[7] 3) review of the massive communications and computer data was performed without any safeguards, 4) the Government failed to conduct the preliminary analysis within 45 days of seizure; and 5) the government affiant failed to inform the magistrate judge that the affiant lacked authority to investigate violations of federal criminal law. (ECF No. 34). In addition, Defendant moves to suppress evidence seized from his home at the time of the execution of the March 8, 2012 search warrant but searched pursuant to the November 2012 warrant. Defendant contends that evidence illegally obtained pursuant to the March warrant formed the basis for probable cause for the November warrant. (ECF No. 33).

Defendant asserts that the application and the affidavit for the March 2012 search warrant show that the procedures for electronically stored data were insufficient on their face and that the warrant application sets forth no screening mechanism to prevent the forensic examiners from access to materials beyond the scope of the warrant. Defendant asserts that the forensic examiners conducted a general search of the computer materials seized beyond the scope of the warrant and ignored the deadlines set in the warrant to complete the investigation. Defendant contends that the forensic examiners extracted massive amounts of computer data beyond the scope of the warrant by accessing and extracting adult pornographic images from his seized computer data. Defendant contends that the November 2012 search warrant was obtained as a result of the material accessed beyond the scope of the March warrant and that the material was accessed outside the 120 day period provided to complete the investigation.

Defendant asserts that the before and after the 120 days deadline for analysis, the Government extracted, analyzed, and downloaded thousands of images of adult pornography that were not within the scope of the warrant. Defendant asserts that the

---

[7]Government has elected to use a "taint attorney." (ECF No. 52). This portion of the motion is denied without prejudice to renew supported by further information.

12CR3429 WQH

Government seized literally everything in the Defendant's electronic life, including his son's computer and subjected it to total review without the safeguards of the procedures in the warrant. Defendant asserts that all subsequent analysis, including the analysis authorized by the November warrant, was a direct result of seizing and searching information beyond the of the March warrant.

The Government contends that the agents properly seized items within the scope of the warrant. The Government asserts that the search warrant contained adequate search protocol for the seized computer data and that the forensic examiners properly conducted the search of the computer data. The Government asserts that the search warrant contained adequate search protocol for the seized computer data and that the forensic examiners properly conducted the search of the computer data. The Government asserts that the search for adult pornography with a date and time stamp fell within the description of the warrant because this case involved whether or not the Defendant was making false statements when he said he was working during specific hours. The Government contends that the Magistrate Judge authorized the seizure and examination of items of "Records relating to activities and whereabouts" and that photos and videos of adult pornography with a date and time stamp are relevant to show whether the Defendant was working when he claim to be working.[8]

The Government contends that the forensic examiners made a good faith mistake when they accessed the computer images after the 120 day period provided to complete the examination. The Government further contends that any information obtained outside the 120 day period was de minimus and represents that it does not intend to use any evidence from the computer data extracted after the 120 day period.

_____

[8]Counsel for the Government stated at argument: "Anything that has a date and a time stamp showed what he was doing at the times he claimed to have been working, so during that time period at the times he claimed to be doing union business would have been relevant and responsive to that warrant, Your honor. " (ECF No. 69 at 54).

## C. Seizure and review of computer data

"The Fourth Amendment requires that a warrant particularly describe both the place to be searched *and* the person or things to be seized. U.S. Const. Amend IV. The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *United States v. Mann*, 389 F.3d 869, 877 (9th Cir. 2004). "The Supreme Court has held that 'the presumptive rule against warrantless searches applies with equal force to searches whose only defect is a lack of particularity in the warrant.'" *United States v. Sears*, 411 F.3d 1124, 1127 (9th Cir. 2005) quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Warrants "lack sufficient particularity when they have failed to specify the items to be seized, or the location to be searched." *Sears*, 411 F.3d at 1127 (citation omitted).

The particularity requirement prevents general, exploratory searches and "ensures that the magistrate issuing the warrant is fully apprised of the scope of the search and can accurately determine whether the entire search is supported by probable cause." *Mann*, 389 F.3d at 877. The Court of Appeals explained the specificity required as follows:

> The specificity required in a warrant varies depending on the circumstances of the case and the type of items involved. Warrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible. While a search warrant must describe items to be seized with particularity sufficient to prevent a general, exploratory rummaging in a person's belongings, it need only be reasonably specific, rather than elaborately detailed.

> In determining whether a description is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant, (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*Id*. at 877-878. (citations and quotations omitted). In the computer context, the Court

of Appeals for the Ninth Circuit has applied the holding in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982) to determine whether the seizure and search of intermingled documents complies with the requirements of the Fourth Amendment. In *United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085 (9th Cir. 2008), the Court of Appeals explained:

> [I]n *Tamura*, 694 F.2d 591, we considered whether the government could seize a set of hard-copy files including target data as well as information not specified in the search warrant. In that case, officers executed a search warrant for three specified categories of records stored at a Los Angeles office. *Id.* at 594. Agents seized—without any limiting effort—files that were not specified in the search warrant. *Id.* at 595. We condemned such "wholesale seizure for later detailed examination of records not described in a warrant." *Id.* (emphasis omitted). Holding that the Fourth Amendment barred the conversion of a specific warrant into a general one, we described two methods by which the government could avoid such constitutional violations.
>
> First, if the government anticipated that on-site segregation of target documents would not be feasible in a reasonable amount of time, it can seek a preordained warrant protocol allowing the seizure of such intermingled documents. This approach would ensure proper judicial oversight of any seizures.
>
>> If the need for transporting the documents is known to the officers prior to the search, they may apply for specific authorization for large-scale removal of material, which should be granted by the magistrate issuing the warrant only where on-site sorting is infeasible and no other practical alternative exists. *See United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir.1982). The essential safeguard required is that wholesale removal must be monitored by the judgment of a neutral, detached magistrate.
>
> *Tamura*, 694 F.2d at 596. Specific authorization to make such seizures depends on detailed information in the government's search warrant affidavits, which should describe "the relevant technological issues," Managing Discovery, supra note 13, at 21, and the feasibility of parsing the anticipated storage media. With such information, a magistrate can set forth guidelines that ensure the government does not seize intermingled data without judicial oversight. If a warrant includes such protocol, and the government abides by it, post-search review is not necessary.

*Comprehensive Drug Testing, Inc.*, 513 F.3d at 1106-1107(footnote omitted).

In this case, Agent Phenicie explained in her affidavit that the Defendant was "suspected of systematically abusing his longstanding role as President of the Union" by charging for various personal expenses and fraudulently charging for "lost wages."

(ECF No. 34-3 at 6). Agent Phenicie informed the Magistrate Judge that the Defendant worked out of his home, using a "desktop computer for use at home and a laptop computer for use during travel." *Id*. at 11. Agent Phenicie opined that "there is probable cause to believe that evidence of Bonner's fraud as more fully described in Attachment B - including, for example, financial and payment records, communications, receipts, and other records in electronic and hard copy format - can be found in Bonner's home." *Id.*

In reliance upon these representations, the Magistrate Judge authorized the seizure and search of a specific list of records "in electronic and hard copy format", including "Records relating to activities and whereabouts - All records or data relating to Terence J. Bonner's day to day activities and whereabouts, including without limitation diaries, day planners, calendars, appointment books, phone and call records, and correspondence." *Id*. at 4-5. This authorization was subject to specific PROCEDURES FOR ELECTRONICALLY STORED INFORMATION which included Computers and Other Electronically Stored Information ("The Procedures"). (ECF No. 34-3 at 12). Agent Phenicie represented to the Magistrate Judge as follows: "With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant." (ECF No. 34-3 at 12). The Order of the Magistrate Judge stated: "This authorization includes the search of electronic data to include deleted data, remnant data and slack space. The seizure and search will be conducted in accordance with the 'Procedures For Electronically Stored Information' provided in the affidavit submitted in support of this warrant." (ECF No. 34-2 at 6).

Seizure and Retention of Instrumentalities

The Procedures stated that "there is probable cause to believe that any computers

and other electronic storage devices encountered during this search are instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime." (ECF No. 34-3 at 13). The Procedures provided:

> [O]nsite confirmation may be provided by an owner or user of the computer or storage device, or if feasible, may be obtained by conducting a limited onsite forensic examination to determine limited onsite forensic examination to determine if the subject media contains any contraband or otherwise is an instrumentality. Computers and other electronic storage devices and media not confirmed onsite as instrumentalities will be taken offsite for preliminary analysis in accordance with subparagraph (b) below.
> b. The offsite imaging and preliminary analysis of computers, other electronic storage devices and media to confirm their status as instrumentalities will be conducted within forty five (45) days of seizure.

*Id.* at 13. In this case, there is no evidence in the record that any onsite confirmation was provided by the Defendant or any other owner or user of the seized computer or electronic storage devices, and no evidence that onsite forensic examination was conducted. Thirty-five items of electronic media were seized, including four computers (three laptops and one desktop), 20 external hard drives, eight floppy disks, two flash drives and a smart phone. This seizure of information clearly included information "swept up only because the government didn't have the time or facilities to segregate it at the time and place of the seizure." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1167 (9th Cir. 2010). Compliance with the Fourth Amendment under these circumstances requires compliance with the protocol set forth in the warrant.

The Procedures provided: "Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the court. An image of the

12CR3429 WQH

items will be retained and subjected to a complete forensic analysis, as provided below." Forensic examiners imaged 100% of the seized electronic media. (ECF No. 33-2 at 8). All of the computers, hard devices and electronic devices seized were returned to the Defendant within a few months and the Government proceeded to conduct a complete forensic analysis to identify and extract relevant data pursuant to the Procedures set forth in the Warrant.

Identification and Extraction of Relevant Data

The Procedures in the warrant provide that "[a]fter obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant." The Procedures outline the analysis as follows:

> Analyzing the contents of computer or other electronic storage devices, even without significant technical issues, can be very challenging. Searching by keywords, for example often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. ...

> Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days from the date of seizure pursuant to this warrant, absent further application to this court.

> **All forensic analysis of the imaged data will employ search protocols directed exclusively to identification of data within the scope of this warrant.**

*Id.* at 13-16 (emphasis added).

The record shows that forensic examiners employed a protocol to search the seized images using a key word list to limit the search to records within the scope of the warrant. In April 2012, the forensic examination was expanded to include pornographic images with a date and time stamp based upon the Government's theory that "anything

12CR3429 WQH

that has a date and a time stamp" shows what the Defendant was doing at the time he claimed to be working. (ECF No. 69 at 54). The Government concluded that this expanded search and seizure of evidence was authorized by the March Warrant which allowed the seizure and examination of "**Records relating to activities and whereabouts**." (ECF No. 34-2 at 5).

> This provision of the Warrant Order contained in Attachment B states in full:
>
> Records relating to activities and whereabouts- All records or data relating to Terence J. Bonner's day to day activities and whereabouts, including without limitation diaries, day planners, calendars, appointment books, phone and call records, and correspondence.

*Id.* In determining whether this provision in the warrant is sufficiently precise to authorize the search conducted by the Government, the Court must determine whether the description of the items to be seized in the warrant was "specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized" and whether "the magistrate issuing the warrant [was] fully apprised of the scope of the search and can accurately determine whether the entire search is supported by probable cause." *Mann*, 389 F.3d at 877. This Court concludes that this provision of the Warrant Order does not meet the specificity requirements as interpreted and applied by the government forensic examiners under either of these requirements.

A fair reading of the Application, the Affidavit and the Order in this case does not reasonably identify adult pornography as an item to be seized or searched pursuant to the warrant. There is no language authorizing the examination and extraction of adult pornography from the imaged data. There is no language authorizing the examination of photographs or videos bearing a date and time stamp.[9] There is no language in the Application, the Affidavit, or the Order that would lead a person

_____

[9]As noted earlier, the only reference to photographs and videos refers exclusively to "cellular telephone device(s) and any storage devices, such as SIM cards or flash memory devices attached to, inserted in or seized with the device." (ECF No. 34-2 at 6).

conducting the search, in this case the forensic examiner, to reasonably conclude that adult pornographic images were within the scope of the "**Records relating to activities and whereabouts"** described as "dairies, day planners, calendars, appointment books, phone and call records, and correspondence." (ECF No. 34-2 at 5).

The Affidavit of Agent Phenicie submitted to the Magistrate Judge described a scheme by the Defendant to defraud the Union "by knowingly and repeatedly submitting false claims for business expenses, in the form of vouchers and credit card statements" and by "knowingly and repeatedly submitting claims for 'lost wages' that were false, and payment of which violated Union policies." (ECF No. 34-3 at 11). The affidavit of Agent Phenicie setting forth a "Basis for Items to be Seized" informed the Magistrate Judge that it is "customary for people who work from home to retain financial records and documents at their residences." (ECF No. 34-3 at 5). The affidavit described "probable cause to believe that evidence of Bonner's fraud . . . can be found in his home." *Id.* at 11. The evidence of this fraud was described as financial and payment records, communications, receipts, and other records "in electronic and hard copy format." (ECF No. 34-3 at 11). The affidavit requested seizure of records such as: "travel and related expenses, including records relating to air and hotel reservations, meals, car rental information"; "copies of purchase receipts for business expenses"; and "vouchers for payment."

There is no language in the Application, the Affidavit, or the Order which would put the Magistrate Judge on notice that the examination of pornographic images for a time and date stamp was contemplated by the Application. There is no language in the Application, the Affidavit, or the Order which would put the Magistrate Judge on notice that she was authorizing the examination and extraction of thousands of images of adult pornography from the imaged data.

The Procedures in the Warrant specifically provided: "All forensic analysis of

the imaged data will employ search protocols directed exclusively to identification of data within the scope of this warrant." (ECF No. 34-3 at 16). "The reasonableness of a search or seizure depends not only on *when* it is made, but also on *how* it is carried out." *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994); *see also United States v. Adjani*, 452 F.3d 1140, 1149 (9th Cir. 2006) ("We understand the heightened specificity concerns in the computer context, given the vast amount of data they can store."). The search protocol employed must be reasonably directed to identify data within the scope of the warrant in order to meet the particularity requirement. Without this requirement, the search of the electronic data becomes "general exploratory rummaging in a person's belongings." *Sears*, 411 F.3d at 1127. In *Comprehensive Drug Testing, Inc.,* the Court of Appeals explained:

> We recognize the reality that over-seizing is an inherent part of the electronic search process and proceeds on the assumption that, when it comes to the seizure of electronic records, this will be far more common than in the days of paper records. This calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interest in law enforcement and the rights of individuals to be free from unreasonable searches and seizures. The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect.

*Comprehensive Drug Testing, Inc.,* 621 F.3d at 1177. In this case, employing a protocol to search items with a date and time stamp in order to examine and extract pornographic images expanded the search to data which the Government had no probable cause to collect. A fair reading of the warrant did not include authorization to seize any item in Defendant's residence with a date and time stamp or authorization to seize photographic images marked with a date and time stamp. The Court concludes that the forensic analysis employed search protocol not directed to identify data within the scope of the warrant and violated the Defendant's rights under the Fourth Amendment.

D. **Remedy**

"[S]uppression is appropriate only if the officers were dishonest or reckless in

preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926 (1984). The Affidavit of Agent Phenicie detailed probable cause to believe that financial records would be found in Defendant's residence in electronic format which would show that he submitted false claims for business expenses and false claims for lost wages. The Court finds that it was not reasonable for agents conducting the forensic examination of the imaged computer data to believe that the warrant authorized the examination, and extraction of thousands of images of adult pornography in the guise of looking for records of Defendant's "whereabouts." (ECF No. 34-2 at 5). The forensic examination was overbroad, and not directed exclusively to identify data within the scope of the authorized search. The Court concludes that suppression of any evidence extracted from all 35 items of electronic media, including four computers, 20 external hard drives, eight floppy disks, two flash drives, and a smart phone is the proper remedy in this case. *See Illinois v. Krull*, 480 U.S. 340, 348-49 (1987) ("evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may be properly charged with knowledge, that the search was unconstitutional under the Fourth Amendment.").

The Court further finds that all evidence searched pursuant to the November 21, 2012 warrant must be suppressed under the facts of this case. "Whether the exclusionary sanction is appropriately imposed in a particular case, ... is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police misconduct." *Leon*, 468 U.S. at 906. Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained directly or indirectly as a result of such a violation is considered "fruit of the poisonous tree" and is not admissible under the exclusionary rule. *Wong Son v. United States*, 371 U.S. 471, 484 (1963).

In this case, the Affidavit of Agent Phenicie in support of the Application for the

12CR3429 WQH

Warrant informed the Magistrate Judge in part as follows:

> The search warrant executed at Bonner's residence resulted in the seizure of many hard drives - including hard drives purchased by Bonner at Union expense - containing millions of images of pornography. The files on these drives appear to have been painstaking (sic) archived by Bonner, including during times for which he was claiming premium pay hours from the Union. Preliminary estimates of the number of pornographic files found exceed four million. Based on this information, it has become apparent that additional forensic work needs to be completed to determine when Bonner was accessing these drives.

(ECF No. 33-2 at 8). The images of adult pornography illegally and unreasonably examined and extracted by the government forensic examiners from the March 2012 search served as a direct basis for the November 2012 warrant. The remedial objectives advanced by the exclusionary rule are directly applicable to the government conduct in this case. *See e.g. Leon,* 468 U.S. at 916 (deter police misconduct).

## CONCLUSION

IT IS HEREBY ORDERED that 1) Defendant's motion to suppress seized evidence from Defendant's home in Campo, California (ECF No. 24) is denied; 2) Defendant's motion for suppression of evidence warrant 12MJ4280 (ECF No. 33) is granted; and 3) Defendant's motion to suppress seized evidence from Mr. Bonner's home (ECF No. 34) is granted in part as stated above.

DATED: July 23, 2013

**WILLIAM Q. HAYES**
United States District Judge

12CR3429 WQH